## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (BALTIMORE DIVISION)

| | |
|---|---|
| **JANE DOE** | * |
| Plaintiff, | * |
| v. | * |
| **UBER TECHNOLOGIES, INC.** | * |
| 182 Howard Street, Suite 8 | |
| San Francisco, California 94105 | *          CASE NO.: **1:20-cv-00370** |
| Serve On Resident Agent: | * |
| The Corporation Trust, Inc. | |
| 2405 York Road | * |
| Suite 201 | |
| Lutherville Timonium, MD 21093 | * |
| and | * |
| **JOHN KENNEY, JR.** | * |
| 5027 The Alameda | |
| Baltimore, Maryland 21239 | * |
| and | * |
| **CHARLES VENEY** | * |
| Jessup Correctional Institution | |
| 7805 House of Correction Road | * |
| Jessup, Maryland 20794 | |
| | * |
| Defendants. | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Jane Doe[1], by and through her attorneys, Roy L. Mason, Zachary E. Howerton, and the law offices of Smouse & Mason, LLC, and hereby sue Defendants Uber Technologies, Inc., John Kenney, Jr., and Charles Veney, and in support thereof states as follows:

## NATURE OF THE CASE

1.     Uber, the corporation behind the largest ridehailing app, has made it clear in its actions and words that it will stop at nothing to make a profit.  To that end, Uber has knowingly placed its female passengers in harm's way.  In the name of the bottom line, Uber has repeatedly turned a blind eye towards the safety of its female passengers.

2.     Female passengers continue to pay the price for Uber's ruthless pursuit of income. Tragically, the model of "profits over safety" is also responsible for the tragedy at the center of this litigation.

3.     Uber markets itself extensively to young women as the best option for a safe ride home after a night of drinking, making a safe ride for young women always within reach, and drunk driving a thing of the past.

4.     But what Uber does not share with passengers is that making the choice to hail a ride after drinking also puts them in peril from Uber drivers themselves.  While claiming that passenger safety is its number one priority, Uber is instead putting these women at risk.

5.     Plaintiff Jane Doe, a college student who was a confident and outgoing young woman with endless potential, is another young, female Uber passenger that the company failed to protect.

---

[1] Plaintiff has filed simultaneously herewith a Motion to Proceed Under a Pseudonym.

6.      In Baltimore, Maryland, on February 17, 2017, Ms. Doe was subjected to nonconsensual sex with her Uber driver, John Kenney, Jr., and was raped by his accomplice, Charles Veney, whom Mr. Kenney called that evening to participate in the illicit acts.

7.      The Uber app was used to arrange a ride to take Ms. Doe home.

8.      Because Mr. Kenney was acting as an agent of Uber at the time he had nonconsensual sex with Ms. Doe, and because he was acting as an agent of Uber at the time he called Mr. Veney to come participate in the illicit acts, and Mr. Veney raped the Plaintiff, Uber is liable for their actions.

9.      Indeed, because Uber is a common carrier, it had the highest affirmative duty to protect Ms. Doe from harm, including nonconsensual sex with her driver and rape by his accomplice.

10.     As detailed herein, Uber's negligence, fraud, misleading statements and other unlawful actions caused Plaintiff's nonconsensual sex and rape, which humiliated, degraded, violated, and robbed Plaintiff of her dignity.

11.     The nonconsensual sex and rape of the Plaintiff has caused her to suffer physical, emotional, and psychological harm from which she will never fully recover.

## **PARTIES**

12.     Plaintiff Jane Doe is an adult woman who is a permanent resident of the state of Puerto Rico.

13.     Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business located at 182 Howard Street, Suite 8, San Francisco, California 94105, that operates throughout the United States.

14.     John Kenney, Jr is an adult male who resides in the state of Maryland.

3

15.     Defendant Charles Veney is an adult male who resides in the state of Maryland.

## JURISDICTION AND VENUE

16.     This is an action seeking damages in excess of $75,000.00, exclusive of interest, costs and attorney's fees.

17.     Federal subject matter jurisdiction arises out of diversity of citizenship pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  In addition, 28 U.S.C. § 1367 provides supplemental jurisdiction for the state law claims.

18.     Further, this Court has personal jurisdiction over Defendants because Mr. Kenney and Mr. Veney are residents of Maryland and because Uber conducts business in Maryland, purposefully directs or directed its actions toward Maryland, and because it has the requisite minimum contacts with Maryland to permit the Court to exercise jurisdiction.

19.     Venue in this District is proper under 28 U.S.C. § 1391(b) because the events giving rise to the action occurred in Baltimore City, located entirely within the geographic boundaries for the District of Maryland.

## FACTS

I.      **Jane Doe**

20.     Prior to February 17, 2017, Ms. Doe was a successful college freshman at Loyola University studying biochemistry with an approximate 3.4 GPA.  She had no history of any psychological issues and was seen by family and peers as a confident and outgoing young woman with endless potential.

4

21.   On the evening of February 17, 2017, Ms. Doe and several of her friends went out to a social event in Baltimore.   While out with her friends, Ms. Doe consumed several alcoholic drinks.

22.   Realizing that she was too inebriated to drive home safely, Ms. Doe relied on the truthfulness of the Uber ads and app and believed that "the safe choice" was to hail a ride from Uber.   Ms. Doe used the app on her cell phone to order a ride back to her dorm room.

23.   Shortly after requesting the ride, Ms. Doe received confirmation from the app her that her driver, John, was on his way to pick her up in a dark Honda Accord.

24.   When John arrived, Ms. Doe asked him if she could sit in the front passenger seat because she had a tendency to get car sick.   John granted her request and Ms. Doe entered the vehicle and buckled her safety belt.

25.   Alcohol consumption caused Ms. Doe to "black out" shortly after confirming the address of her dorm with John.   When Ms. Doe awoke, she found herself in an isolated location with John, whom she later identified by photo array as John Kenney, Jr., on top of her and in the process of engaging in nonconsensual sex with her.

26.   Ms. Doe's seatbelt was still buckled and her arms were tangled in the seatbelt straps.   She immediately began screaming for Mr. Kenney to stop.   However, Mr. Kenney stated, "My name is John, I'm wearing a condom, it's ok", and continued.   In her terrified struggle to get Mr. Kenney off of her without endangering her life, she vomited on herself and Mr. Kenney.   After this, Mr. Kenney ceased the nonconsensual intercourse with Ms. Doe.   As Mr. Kenney had driven to an unfamiliar, dark alley somewhere in

Baltimore City, Ms. Doe feared leaving the vehicle and had to endure the terrifying ride back to campus with Mr. Kenney.

27.   When Ms. Doe arrived back on campus, her roommate immediately knew that something was wrong because Ms. Doe's mascara was running, she was carrying her shoes, her dress was disheveled, and she looked to be in a state of shock.  When her roommate asked Ms. Doe about her night, Ms. Doe began hysterically crying and fell to the floor. Her roommate was able to make out from Ms. Doe that her Uber driver had nonconsensual sex with her.  Ms. Doe's roommate assisted her in changing her clothes and putting her dress and undergarments into a clean bag.  Ms. Doe was terrified, exhausted, and afraid to leave the room.  Her roommate consoled her and told her to rest for a few hours, but that they would need go to the hospital first thing in the morning.

28.   At approximately 8:00 a.m. that morning, February 18, 2017, Ms. Doe's roommate alerted Loyola Campus Police that Ms. Doe was subjected to nonconsensual sex with a stranger the previous night.  Ms. Doe underwent a safe exam at Mercy Medical Center in Baltimore City, Maryland.  During the exam, hospital staff removed Ms. Doe's tampon from the night before, as it had become lodged deeply in her body from the sexual trauma.  A forensic examination revealed that there was DNA in Ms. Doe's cervical area. One of the DNA samples matched a sample provided by Mr. Kenney's accomplice, Charles Veney, whom Ms. Doe did not know and had never met.  Based on the match, Ms. Doe learned that she was raped by Mr. Veney while she was unconscious.

29.   When the Baltimore Police Department detectives interviewed Mr. Kenney, Mr. Kenney stated that the events of the evening were recorded on his cellphone via pictures and video.  The detectives then seized and searched the cellphone and found calls and text

messages to Charles Veney on the night of February 17, 2017, as well as pictures and videos of Ms. Doe's unconscious, limp, and half-naked body between the two men.

30.    Immediately after the terrifying events of that evening, Ms. Doe missed countless days of her college coursework.  She reached out to the Loyola University Title IX coordinator, who referred her to Sheila Graham, Ph.D., Associate Director of the Counseling Center and student counselor at Loyola University.  Ms. Doe remained in school, but her grade-point average plummeted from what she had achieved her first semester.  The extreme emotional, physical, and psychological trauma of the events of that evening led Ms. Doe to contemplate suicide.  She determined it was best to suspend her educational pursuits and return her parent's home in Puerto Rico, where she began seeing a psychiatrist, Juan Rodriguez, M.D.

31.    She has been prescribed Zoloft, Xanax, Tropol, Seraquil, Metaprolol, Quetiapine, Sertraline, and Alprazolam to manage her insomnia, anxiety, and anxiety-induced high blood pressure.  She could not return to Baltimore and Loyola University because of the trauma of the events of February 17, 2017 and remained a resident of Puerto Rico with her family.

32.    The quality of Ms. Doe's life has been destroyed by the emotional and psychological damage resulting from the nonconsensual sex at the hands of her Uber driver and rape by his accomplice.  She will bear this trauma for the rest of her life.

**II.    John Kenney, Jr.**

33.    Upon information and belief, Mr. Kenney was employed as an Uber driver prior to February 11, 2017.

34.   Upon information and belief, as a result of multiple complaints about his service, Mr. Kenney lost his Uber driving certificate on February 11, 2017, seven days before the incident at issue in this litigation.

35.   Upon information and belief, despite losing his Uber driving certificate, Mr. Kenney's access to the Uber app as a driver continued uninterrupted because Uber was negligent in failing to prevent ongoing use of its app by drivers it had terminated.  Mr. Kenney's access to the Uber app remained uninterrupted because Uber negligently failed to terminate or block his access, ability, and continued use of Uber app to pick up passengers using the app in the City of Baltimore.

36.   Upon information and belief, on February 17, 2017, Mr. Kenney used the Uber app as a driver and accepted Plaintiff's ride request in order to engage in sexual conduct with her.

37.   Upon information and belief, after Plaintiff entered the vehicle, fastened her safety belt and fell unconscious, Mr. Kenney proceeded to drive her to an unknown location, parked the vehicle, and engaged in nonconsensual sex with the Plaintiff.

### III.   Charles Veney

38.   Upon information and belief, at some point during the evening of February 17, 2017, Mr. Veney received call(s) and/or text message(s) from Mr. Kenney concerning the Plaintiff.

39.   Upon information and belief, Mr. Veney went to the location of Mr. Kenney and the Plaintiff, who was unconscious at the time.

40.   Subsequently, Mr. Veney raped the Plaintiff.

41.   Upon information and belief, before Plaintiff regained consciousness, Mr. Veney left the scene.

42.     On November 18, 2019, Charles Veney was convicted at trial in the Circuit Court for Baltimore City by a jury of his peers of Rape in the Second Degree, Sex Offense in the Third Degree, and Assault in the Second Degree.   He awaits sentencing, currently scheduled for February 26, 2019, at the Jessup Correctional Institution in Jessup, Maryland.

### IV.     Uber Technologies, Inc.

43.     Launched in San Francisco in June 2010, Uber calls itself a "transportation network company."   In the industry called "ridehailing," Uber connects drivers and members of the public through a downloadable smartphone application ("app") called "Uber." Consumers who have downloaded the app use it to make a ride request.   They are matched with an Uber driver who picks them up and drives them to a previously specified destination.   App users must pay for the ride through the app with a credit card. Uber pays the driver a share of the fare collected, and retains the remainder.   Uber's sole source of revenue is from charges to passengers for rides taken.

44.     As detailed *infra*, Uber's business model requires an enormous pool of drivers in order to provide rides to consumers quickly and efficiently.   To accomplish this, Uber solicits and retains thousands of non-professional drivers.

45.     Uber expanded nationally by entering cities and ignoring long-standing legal and regulatory authority for taxi and limousine services.   Such laws exist for many of the safety concerns raised by this lawsuit.   By flouting safety regulations, and by hiring non-professional drivers, Uber dominated the vehicle-for-hire market in a fraction of the time it would have taken had it entered the transportation market through traditional methods.

46.     "Profits over safety" quickly became the operating model for Uber's expansion.

### V.        Uber is a Common Carrier and Drivers Are Transportation Agents for Uber

47.     Uber is a common carrier and its drivers are agents that provide a service to Uber.   In
        Maryland, Uber has agreed that it is a common carrier.

48.     Uber provides rides to members of the public for a fee.   Uber does this as an enterprise
        engaged in "selling rides" in the same way that a private taxi service sells transportation
        services.

49.     When Uber agrees with a passenger via the app to carry out a contract of transportation,
        drivers are the individuals who pick up the passenger at a certain location and transport
        the passenger to a certain location.   The fact that Uber utilizes software to contract with
        consumers does not alter the essence of its business enterprise – namely, that of a
        transportation provider.

50.     When drivers perform the transport, they are the legal "agents" of Uber.   At all times,
        Uber is the "principal" in the relationship.   Use of an app to organize the ride does
        nothing to alter the agent/principal relationship.   In fact, the app is simply a modern
        version of the traditional method where consumers had to telephone a taxi company in
        order to arrange for their ride.

51.     Similarly, consumers can, and often do in large cities, use the app to order an Uber when
        they are on the street.   Using the app eliminates a person from raising their arm in a
        traditional street "hail" but, effectively, the Uber app is no different from hailing a taxi,
        but for the fact that the passenger has a credit card account on file with  Uber and the
        monetary transaction takes place via the app.

52. In sum, Uber's self-serving claim that it operates as a "technology" company and not as a traditional taxi service, does nothing to disassociate the essence of its business services as anything outside of a taxi service.

53. When drivers perform the transportation, they are acting at all times pursuant to Uber's control and serve to carry out the performance on behalf of Uber.  In connection with this, all money is exchanged between passengers and Uber, and all agreements about the transportation service flow between passengers and Uber.

54. At no time do passengers personally contract with drivers for transport in exchange for a fee.  Uber, not its drivers, is the sole decision-maker when it comes to pricing, rates, fares, or payments provided.

55. Passengers pay Uber; Uber pays drivers.

56. Because Uber is a transportation company that provides rides to the general public for a fee, it is subject to the laws governing common carriers.

57. When drivers carry out a contract of transportation for Uber, Uber is under a non-delegable duty to transport passengers safely.

58. At all times, drivers, whether labeled "agents" or "employees" of Uber, also are held to transport passengers according to a higher standard of care.

59. Indeed, Uber, as a common carrier in Maryland[2], is required to use the highest degree of care to provide safe means and methods of transportation for its passengers.[3]

---

[2] Maryland Public Service Commission, In the Matter of an Investigation to Consider the Nature and Extent of Regulation Over the Operations of Uber Technologies, Inc. and Other Similar Companies, Order Number 86528, Issue Date: August 06, 2014, available by order number at https://www.psc.state.md.us/commission-orders/.

[3] The Maryland Court of Appeals has stated: "A common carrier owes its passengers *the highest degree of care to provide safe means and methods of transportation* for them." *Todd v. Mass Transit Admin.*, 373 Md. 149, 156, 816 A.2d 930, 934 (2003) (emphasis added).

60.     Furthermore, it must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to its consumers.

61.     In connection with this duty of care, Uber is required to, but does not, make policy decisions at all levels of Uber's management to ensure that the highest care is exercised with respect to Uber's transportation of consumers.

**VI.     Drivers Are Employees**

62.     Uber employs its drivers in traditional at-will relationships, in which the Company has the discretion to fire its drivers for any reason and at any time.

63.     Drivers are not charged a fee by Uber to apply to become employees.

64.     Drivers are not charged a fee to download the app to receive notifications of rides mediated by Uber.

65.     Furthermore, fare prices for rides are set exclusively by Uber executives. Drivers have no input on fares charged to consumers.   Drivers are not permitted to negotiate with consumers on fares charged.

66.     However, Uber can and does directly modify charges to consumers if Uber determines that a driver has taken a circuitous route to a destination.

67.     Uber takes a fee ranging between twenty percent (20%) and thirty percent (30%) of every ride charged to a consumer.

68.     Uber controls its drivers' contacts with its consumer base, and considers its consumer list to be proprietary information.   To that end, drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber app.

69.     Uber requires its drivers to accept all ride requests when the drivers are logged into the app.   Drivers who reject too many ride requests risk facing discipline, including suspension or termination.

70.     Consumers give feedback on rides they have taken, and rate drivers on a scale from 1-5 stars.  These ratings are used by Uber to discipline and terminate drivers.

71.     Despite the above facts, as a matter of policy, Uber claims that drivers are not at-will employees, but rather independent contractors.   The value of classifying drivers as independent contractors is an integral part of the ridehailing company's business model and has saved Uber millions of dollars.

### VII.     Inadequate and Careless Background Checking Process: Willful Blindness in Hiring and Supervising Drivers

72.     As a common carrier in Maryland[4], subject to the highest degree of care to provide safe means and methods of transportation for its passengers, Uber owed a duty to implement a thorough and effective background checking process, carefully hire qualified drivers and supervise its drivers for the protection of its passengers.

73.     However, Uber, from the highest executive levels, including directors, officers, and managing agents, made an intentional decision to look the other way when hiring and supervising drivers.   As a calculated cost-cutting device, Uber used a procedure to review a potential driver's background that is inherently flawed.   Specifically, the background checking methods used by Uber cannot assure passengers that the driver behind the wheel does not have a history of violence or other background information

---

[4] Maryland Public Service Commission, In the Matter of an Investigation to Consider the Nature and Extent of Regulation Over the Operations of Uber Technologies, Inc. and Other Similar Companies, Order Number 86877, Issue Date: February 26, 2015, available by order number at https://www.psc.state.md.us/commission-orders/.

that would cause a reasonable company to make further inquiries into a potential driver's history.

74.    To become a driver for Uber, individuals apply through Uber's website.  The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance.  Drivers need not show that they own the vehicle that will be used to transport rides.

75.    At no point does Uber verify that the person applying to be the driver is uploading his or her own personal documents, including his or her own profile photo which can be used to verify the accountholder.  As a result, numerous drivers have registered to drive on the Uber app by using falsified identities, false social security numbers, false driver's licenses and false photos.

76.    In September 2016, Uber announced the introduction of "Real-Time ID Check" a new security feature where drivers are periodically prompted to take a photo of themselves using their app (a "selfie") as a condition of accepting and continuing ride requests.

77.    Facial recognition technology is used to analyze the selfie and verify that the driver using the app at that time is the same person whose photo is registered on file.  Uber states that if the facial recognition technology does not match the selfie to the profile picture on the driver's Uber account, the account will be suspended pending investigation.

78.    However, the Real-Time ID Check feature does not prevent a driver from setting up an account using someone else's identity, but uploading their own photo, which would then bypass the sporadic selfie check.

79.    In addition, it has been reported that hackers have been able to bypass facial recognition software by using composites of images from sources with resolutions as low as those available on Facebook or other social media websites.

80.    Until approximately 2015, Uber employed Accurate Background, Inc. ("Accurate"), formerly known as Hirease, LLC ("Hirease"), a private background check company.

81.    Upon information and belief, the Company used Accurate at the time Mr. Kenney signed up to drive for Uber.

82.    Accurate did not perform stringent background checks.  Drivers were not required to submit fingerprints for comparison against Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") databases.   Rather, Accurate simply ran potential drivers' social security numbers through records databases similar to those held by credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions.

83.    As such, if a potential driver was convicted of a violent crime ten years prior to applying to become an Uber driver, the Company would have no way of knowing such a fact. Uber simply looks the other way when it comes to any acts that may have occurred beyond the arbitrary seven-year cut-off.

84.    Moreover, through these procedures, Uber fails to conduct a seven-year review of any information for drivers who have resided in the U.S. for less than that time.  Uber simply ignores any period beyond what records it can obtain in the U.S.  By way of example only, if an Uber driver moves to a city in the U.S. from another country, such as Canada, the United Kingdom, or France, and has resided in the U.S. for only a few years, the only

records reviewed by Uber pertain to records available in the U.S.  No steps are taken to inquire about the potential driver's history from his or her former country.

85. Indeed, if a potential driver knows that he will be unable to pass even the lenient existing background checks, that potential driver could simply ask a friend to share their information and thus gain access to driving on the platform.

86. Shockingly, Uber failed to implement stricter background checks for its potential drivers to whom Uber passengers will later entrust their lives and well-being, despite knowing that job applicants frequently submit false information to their employers, especially online.  In fact, Hirease acknowledged on its website that many job applicants lie about information they submit to an employer, and that "40% of resumes contain material lies or omissions about education, past employment or qualifications."

87. Hirease also has recognized the importance of background checks to weed out applicants with criminal backgrounds.  As Hirease stated, "10% of job applicants have a criminal record."  Nonetheless, Uber does not require fingerprint background checks for its applicants, which would turn up a person's criminal history beyond the seven-year period.

88. Moreover, if a driver commits a crime and is convicted of it after Accurate ran its initial background check, Uber will not be notified.

89. Upon information and belief, beginning in 2015, Uber has started using Checkr, Inc. ("Checkr") to conduct background checks. Unfortunately, Checkr operates in substantially the same manner as Hirease and Accurate.

### VIII. Uber's Deficient Background Checks Exposed by Massachusetts and Maryland Regulators

90.  The faulty and defective quality of Uber's screening of drivers' histories were exposed by the states of Massachusetts and Maryland.

### A.  Massachusetts Exposes More Than 8000 Drivers with Criminal Histories

91.  Before this incident, in January 2017, pursuant to an agreement between Uber, Lyft (a ridehailing app similar to Uber), and the State of Massachusetts, Uber and Lyft drivers were subjected to state-run background checks. Notably, this additional screening was intended for drivers that had passed Uber's background test already.

92.  According to media reports, approximately 70,789 Uber and Lyft drivers applied to the newly formed Transportation Network Division for a Massachusetts state license and thus, had background checks run on them.

93.  In April 2017, the Massachusetts Department of Public Utilities announced that more than 8,000 Uber and Lyft drivers failed the state screening even though these drivers already had passed background checks at Uber and Lyft.

94.  Alarmingly, the state rejected 8,206 of the drivers.  Among those rejected, it was reported that **1,599 drivers were found to have a history of violent crime**, and incredibly, Uber and Lyft background checks had **failed to identify 51 registered sex offenders.**

### B.  Maryland Exposes Uber's Deficient Background Screening

95.  In December 2016, the Maryland Public Service Commission ("Maryland PSC") approved alternative background checks for Uber and Lyft drivers after both companies claimed that their background screening processes were more comprehensive than fingerprint-based checks.

17

96.     Maryland PSC's more stringent requirements included an annual background check for each driver; a requirement that a Transportation Network Company (any company that provides a ridehailing service similar to Uber and Lyft) must provide written confirmation that they have verified the identity of the driver; and extending the background check to the applicant's entire adult life, going beyond the seven years that Uber's commercial background checks currently review.

97.     Figures released by Maryland PSC in April 2017 show that since implementing the state's expanded background checks of 70,991 Uber applicants, **4,310 applications were rejected**, for reasons that include criminal convictions. Upon information and belief, these criminal convictions were not caught by Uber's "more comprehensive" background checks.

98.     Shockingly, in October 2017, Maryland PSC reported that in the last six months, nearly 15% of new ridehailing drivers in Maryland were cast out and banned from driving in Maryland as a result of the state's own screening of drivers, even though these drivers had passed the background checks of Uber and Lyft. Importantly, Maryland PSC reported that in 95% of the cases where drivers were rejected, the individuals were drivers for Uber. Maryland PSC stated that at least 460 drivers were banned because of "disqualifying criminal histories."

99.     This October 2017 study covered the timeframe of the February 17, 2017 incident and reflects the state and magnitude of Uber's negligence in identifying and monitoring drivers with histories of prior bad acts or criminal records.

### IX.        Inadequate Safety Measures: Willful Blindness to the Protection of its Riders

100.    As a common carrier in Maryland, subject to the highest degree of care to provide safe means and methods of transportation for its passengers, Uber owed a duty to implement safety policies, protocols, and measures for the protection of its passengers.

101.    However, Uber, from the highest executive levels, including directors, officers, and managing agents, exhibited willful blindness to the enactment of reasonable safety policies, protocols, and measures for the protection of its riders, despite knowing that it had instituted an inadequate background checking process and despite disclaiming day-to-day supervision of its drivers.

102.    Uber failed to implement safety policies and protocols, train its drivers on those policies and protocols, and enforce compliance with its policies and protocols.

103.    Uber failed to implement safety measures that would protect its riders, including, but not limited to: detection of rare events such as unexpected long stops, deviations from routes, or possible vehicle crashes; connections for riders and drivers to 911 with the simple press of a button in the event of an emergency; the ability to share trip details and location automatically with first responders and/or designated loved ones who can then follow riders on their trip on a map in real time and know when the riders have arrived; verification of rides with a code that riders can verbally provide to their driver, who will have to enter it into their own app in order to start the trip to ensure that riders get into the right car; the immediate and effective deactivation of a driver's access to the Uber app in the event that the driver's certification has been revoked or suspended; and publication of the names of drivers whose certifications or have been revoked or suspended.

104.    Had Uber implemented adequate safety and security measures, including adequate driver screening, background check procedures, ongoing monitoring of driver conduct while driving, and safety measures such as those described above, particularly the immediate and effective deactivation of a driver's access to the Uber app in the event that the driver's certification has been revoked or suspended, Plaintiff would not have been harmed.

**X.     Material Misrepresentations to Passengers that Uber Provides the "Safest Rides on the Road"**

105.    The application process to become an Uber driver is simple, fast, and designed to allow the Company to hire as many drivers as possible while incurring minimal associated costs.  Such cost saving, however, is at the expense of passengers, especially female passengers.

106.    Indeed, in a complaint filed by the District Attorney of San Francisco and the District Attorney of Los Angeles, *The People of the State of California v. Uber Technologies, Inc.*, Case No. 14-cv-543120-CGC (Superior Court of the State of California, filed August 18, 2015), it was alleged that Uber's security screening is so deficient that, upon information and belief, individuals *passed* Uber's screening process and were found driving for Uber with the following felony convictions: (1) second degree murder; (2) lewd and lascivious acts against a child under the age of 14; (3) sexual exploitation of children; (4) kidnapping for ransom with a firearm; (5) assault with a firearm; (6) grand theft; (7) robbery; (8) identity theft; (9) burglary; and  (10)  taking a vehicle without consent.  In addition, a number of Uber drivers, upon information and belief, had

previously been convicted of driving under the influence and driving with a suspended license and yet still passed Uber's purportedly strict background checks.

107.  Rather than notify passengers of these failures, Uber fills its website with pictures of smiling young women entering and exiting vehicles, which are meant to appear "safe."













108.    In fact, Uber has misrepresented to consumers, on a global scale, on its website, the

following:

> **Wherever you are around the world, Uber is committed to connecting you to the safest ride on the  road.**  That means setting the strictest safety standards possible, and then working hard to improve them every day. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – **what we are doing in the US is an example of our standards around the world**. (emphasis added).

23

109.   Until October 2014, Uber represented on its site that, "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three step criminal background screening for the U.S. – **with county, federal and multi-state checks that go back as far as the law allows** – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

110.   However, because Uber disclaims day-to-day supervision of its drivers, it cannot be aware of how often drivers pick up passengers while the drivers *themselves* are intoxicated, under the influence of other drugs, or bear malintent.  This is problematic for many obvious reasons, not least because Uber drivers can convey a passenger to a destination, stop for alcoholic drinks and/or illicit substances or illicit activities, and then turn the app back on and continue driving, putting the passenger in unnecessary danger.

111.   In fact, upon information and belief, nothing stands in the way of an Uber driver, looking to earn as much as possible, from keeping their app signed in and accepting rides for a 24-hour shift, which would also be incredibly dangerous to passengers.

112.   Although Uber attempts to distance itself from situations in which it would potentially incur liability, a consumer would need to sift through pages of text and click through multiple links in order to even find the following section in which Uber unbelievably tries to disclaim responsibility for negligent and harmful conduct by its own drivers:

> You understand, therefore, that by using the application and the service, **you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe or otherwise objectionable**, and that you use the application and the service at your own risk (emphasis added).

113.   Ms. Doe was a victim of "unsafe," "dangerous" and "offensive" conduct by her Uber driver and his accomplice.

24

### XI.     Uber Targets Intoxicated Passengers

114.    Uber's advertising campaigns make the assertion that it provides the best option for a safe
ride home after a night of drinking.  Indeed, the Company commissioned a report with
Mothers Against Drunk Driving ("MADD") where it declared: "When empowered with
more transportation options like Uber, **people are making better choices that save
lives**" (emphasis added).  Uber further claimed that "Uber and MADD are working
toward a world where a safe ride is always within reach and where drunk-driving is a
thing of the past."

115.    The report and others have been widely publicized by Uber and its press team, correlating
the existence of Uber drivers and vehicles in a city with diminished drunk driving rates.
Uber's marketing campaign has expanded to include discounts for Uber users to
purchase the "Breathometer," a smartphone breathalyzer, and the companies have
partnered to provide rewards in exchange for continued use.

116.    What Uber has not shared with passengers is that making the choice to hail a ride after
drinking also puts those same passengers in peril from the Uber drivers themselves.  By
marketing heavily toward young women who have been drinking while claiming that
passenger safety is its number one priority, Uber is instead putting these women at risk.

117.    Although Uber advertises that it is committed to providing consumers with the "safest
ride on the road," the reality is that at the hands of an Uber driver and his accomplice,
Plaintiff was subjected to traumatic and harrowing sexual acts that no person should be
forced to endure.

XII.    **The Number of Reported Incidents of Sexual and Other Assaults by Uber Drivers, Largely Against Female Passengers, Indicates Systemic Deficiencies Regarding Uber's Safety Measures Concerning Drivers.**

118.    Sadly, the case herein is not an anomaly.  Rather, a litany of incidents regarding sexual assaults, and physical assaults, by Uber drivers on passengers, shows a pattern of similarly heinous, but avoidable attacks.

119.    On April 30, 2018, CNN reported that at least 103 Uber drivers in the U.S. had been accused of sexually assaulting or abusing their passengers over the prior period of four years.  CNN found that at least thirty-one drivers have been convicted for crimes ranging from forcible touching and false imprisonment to rape, and dozens of criminal and civil cases are pending.  This is significant given many of the women raped or attacked by the 103 accused drivers uncovered as a part of CNN's investigation had been drinking, or were otherwise inebriated, at the time of the incidents.

120.    Further, Uber's own U.S. Safety Report, published on December 5, 2019, revealed that Uber received nearly 6,000 U.S. sexual assault claims in the past two years.

121.    By way of example only, and to provide an overview, a few examples are set forth below:

122.    On November 14, 2017, a class action complaint was filed in the U.S. District Court, Northern District of California against Uber, alleging claims for injunctive and declaratory relief on behalf of a proposed Class of female passengers that have experienced rape, sexual assault, or gender-motivated harassment at the hands of their Uber drivers. *See Doe 1, et al. v. Uber Technologies, Inc.*, Case No. 3:17-cv-06571.

123.    On or around September 4, 2017, Ismael D. Moussaoui, a Seattle-based Uber driver, was charged with second-degree rape for allegedly attacking a 23-year-old woman. In court documents, prosecutors alleged that, "The defendant used his position as a car service

26

driver to prey on the victim…[he] sexually assaulted the victim in the backseat of his car. The victim was able to fight him off and was left on the side of a road screaming and partially clothed."

124.  In August 2017, a Massachusetts Uber driver admitted to exposing himself to multiple young girls and was sentenced to two and a half years in jail. The driver, Paul Griffin ("Griffin"), aged 29, was charged with six counts of open and gross lewdness, six counts of accosting and annoying a person of the opposite sex, operating a motor vehicle to endanger, failure to stop for police and resisting arrest. In addition to jail, the court ordered that Griffin was barred from employment with any ridehailing or taxi company.

125.  An Orange County, California Uber driver was charged with raping a female passenger in his vehicle in March 2017 while driving the woman home from a company gathering in Newport Beach.

126.  Unsurprisingly, Uber offered its scripted but hollow public statement, "**Nobody should have to go through what this woman reported to police**."   Incredulously, Uber has issued this same statement countless times over the last seven years, yet reports of violence against female passengers continued to increase at a shocking pace.

127.  In the summer of 2016, a Drexel University student reported publicly that she was sexually assaulted by an Uber driver.  The young woman stated she and a friend were out at the Philadelphia Museum of Art and called an Uber Pool to head home. A young man was sharing their ride and was sitting in the back seat. Her friend was dropped off first and, although her apartment was just four blocks away, the Uber driver claimed that he "took a wrong turn" and dropped off  the  male passenger first.  Thereafter, the Uber driver started touching her.  The woman said she was "pressed up against the corner of

the car" and saying "please stop, please stop." When the car stopped at a light, she luckily was able to maneuver the locks and escape into the street where she called for help.

128.     On or around August 22, 2015, Efren Madrigal ("Madrigal"), a newly minted Uber driver who had been on the road for only three days, was accused of raping a passenger in New Jersey.  The female passenger and a friend had initially invited Madrigal in to play cards and chat after he picked them up through Uber and dropped them off at the victim's home.  The friendly encounter rapidly became dangerous, however, as Madrigal allegedly then proceeded to assault the woman who had ridden with him.  Uber stated that the incident was "deplorable" and that Madrigal was blocked "as soon as [Uber was] made aware of the allegations."

129.     In August 2015, a female Uber passenger in Dallas alleged that her driver had raped her. It was discovered that her Uber driver had been convicted of a number of felonies but was approved to drive for Uber.  The driver allegedly followed her into her apartment and raped her there.  Uber later issued details regarding the investigation it undertook of the driver and admitted to improperly permitting him to drive.

130.     On April 30, 2015, a female Uber passenger in New York City alleged that she was sexually assaulted and groped by her Uber driver.  After falling asleep during the ride, she claims that she awoke to her driver caressing her face, after which he grabbed her face, and leaned in for a kiss.  Fortunately, she was able to escape, but stated that "If I hadn't pushed him away, then I'm pretty certain he would have done more."

131.     In late April 2015, a University of Southern California ("USC") student accused an Uber driver of raping her while she was unconscious, unaware, and unable to consent to any sexual acts.  Ironically, in March 2015, USC had issued a crime alert about an alleged

sexual assault and recommended that students use Uber to stay safe.  That language was excluded from the campus alert sent out after the April 2015 incident.

132.    Also in late April 2015, two women were allegedly assaulted in Madison, Wisconsin by their Uber driver(s).

133.    On February 6, 2015, in Philadelphia, Pennsylvania, a female passenger alleges that she was raped and kidnapped by her Uber driver.   According to a police report, the Uber driver held her down, ripped her pants, raped her, and then held her captive, continuing to drive her around for nearly two hours, refusing to let her out of the car.  Uber claims that it was unaware of any such incident until forty days after the victim first reported the alleged sexual assault.  Indeed, the Uber driver remained on the road, continuing to drive for Uber, for the duration of that time.

134.    In December 2014, an Uber driver in Los Angeles allegedly attempted to grab and kiss a female passenger, who happened to be South African singer/songwriter Nikki Williams, on her driveway.  Ms. Williams was able to fight him off and run inside her house.

135.    Furthermore, on August 14, 2014, an Uber driver in Washington, D.C. was accused of sexually assaulting a passenger in the back of his Uber car.  The passenger accused the driver of touching her while she was asleep in the car.

136.    Likewise, in September 2014, an Uber driver in Orlando, Florida was arrested after a female passenger accused him of grabbing her breast and fondling it in an aggressive manner.  The driver was accused of repeatedly commenting on her appearance before stopping the car and shoving his hand in her tank top to fondle her breast.

137.    Moreover, on December 6, 2014 in Boston, Massachusetts, Uber driver Alejandr Done ("Done") allegedly pulled up to a residence and picked up a young woman waiting for

the pre-arranged driver.  The woman had been out with friends and decided to use a car service to get home.  Done picked up the woman and allegedly drove to a location that she was not familiar with, pulled over to a secluded area and jumped in the backseat, struck her with his hands, strangled her, locked the car doors so that she could not escape, and sexually assaulted the woman.  In October 2015, Done pleaded guilty to aggravated rape, kidnapping, and assault and battery of his female Uber passenger.   He was sentenced to serve 10 to 12 years.

138.   In Washington D.C., in December 2012, an Uber driver allegedly grabbed a 20- year-old female passenger from behind as she exited the car, knocked her to the ground causing her head to hit the concrete, and then raped her.

139.   The above examples are just a sampling of the number of accusations of violent and aggressive behavior made against Uber drivers by unsuspecting female passengers.

140.   Such tragic incidents, while avoidable, are no surprise given Uber's hollow commitment to consumer safety.

### XIII.   Uber's Perpetration of Fraud and Misleading Advertising

141.   This lawsuit seeks to compensate Ms. Doe for the sexual assault that she suffered due to Uber's inadequate and disingenuous "commitment to safety."

142.   Uber, in line with its slogan of "Expanding Globally," aggressively and intentionally disregarded years of policy and regulation controlling taxi and transportation infrastructures around the country.

143.   Had Uber not sacrificed passenger safety for the sake of profit and expansion, and actually cared about who it was employing to drive its vehicles and what safety measures were implemented for the protection of its riders, rather than being preoccupied with

racing to control its share of the taxi market, at the expense of existing taxi companies and consumers, Plaintiff would not have been harmed.

144.   Uber knowingly misled the public about the safety and security measures it employed to ensure even basic levels of consumer safety.

145.   Passengers, including Plaintiff, reasonably relied on Uber's representations and promises about its safety and security measures, including its driver screening, background check procedures, and ongoing monitoring of driver conduct while driving for Uber.  Uber's passengers, including Plaintiff, utilized Uber's taxi services as a result of this reliance.

146.   Had Uber knowingly provided truthful and accurate data about its procedures as compared to the stringent methods used by licensed taxi and for-hire car companies throughout the U.S., including its comparatively deficient driver screening, background check procedures, and monitoring of driver conduct while driving for Uber, reasonable consumers, passengers and Plaintiff would not have downloaded the app or purchased rides on the app for transport.

147.   Uber's ads not only specifically targeted young women, but also portrayed itself as a safe choice for women travelling alone in unsafe and/or unfamiliar areas.  Plaintiff's trust and belief in Uber's marketing made her particularly vulnerable as a newcomer to the City of Baltimore.

148.   Uber engaged in these misleading and false advertisements and representations at all times, including by making such representations on multiple media platforms, including its website, paid internet ads, magazines, newspapers, billboards, and the sides of buses.

149.   Uber engaged in its intentional misrepresentations for the express purpose of protecting its brand, its reputation, and to increase profits by increasing the number of rides and rides requested as a result of consumers reliance on the false information.

150.   For instance, after visiting Uber's website before signing up for the Uber app, Plaintiff was aware of Uber's multiple promises to consumers that consumer safety was a priority. Among those statements, *inter alia*, were the following:

> "Wherever you are around the world, Uber is committed  to connecting you to the safest ride on the road.  That means setting the strictest safety standards possible, then working hard  to improve them every day.  The  specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – what we're doing in the US is an example of our standards around the world."

> "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind."

> "Making cities better is at the heart of everything we do. It's much more than improving the way people get around. It's celebrating what makes those cities special, caring about the people who make them great, and being responsible citizens. That's why we work hard to keep our streets safe for everyone, whether they're on foot, on a bike, or in another car."

151.   In deciding to download the Uber app, Plaintiff relied on advertisements that recommended taking Uber instead of driving while intoxicated.

152.   Plaintiff relied on these representations and rode in vehicles driven by Uber drivers as a result.  Uber knew that its representations and promises about passenger safety were false and misleading, yet continued to allow its passengers to believe in the truth of its representations and promises, and to profit from its passengers' reliance on such representations and promises.

153.    Unsurprisingly, in the United States, despite its proclamations that consumer safety is its top priority, Uber has actively pushed back against legislation and other measures requiring strong background checks for its drivers out of the public's view.  For instance, according to media  accounts, in Colorado,  Uber persuaded lawmakers to ease drivers' background checks in a bill legalizing ridehailing companies, including abolishing FBI background checks and fingerprint checks.  Similarly, media reports indicate that in Illinois, Uber lobbied Governor Pat Quinn to veto a bill that would have forced Uber to strengthen background checks.

154.    In California, Uber is alleged to have helped defeat a law that would have required drivers to undergo a background check by the state's Justice Department, as is required of taxi drivers.

155.    In addition, Uber has been repeatedly sued for its deceptive practices regarding background checks.  For instance, as referenced above, the district attorneys of San Francisco and Los Angeles filed suit against Uber alleging that the Company had misled consumers about its background checks by misrepresenting the extent to which Uber screens its potential drivers.

156.    These efforts, all in the name of "profits over safety", furthered events such as those described in this litigation and give rise to the following causes of action.

### COUNT I – NEGLIGENCE
**(Against Defendant Uber Technologies, Inc.)**

157.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

158.    Uber owed Plaintiff and the general public the highest duty of care to provide safe means and methods of transportation for its passengers.

159.    Uber breached the duty of care owed by failing to implement adequate safety and security measures, including adequate driver screening, background check procedures, ongoing monitoring of driver conduct while driving, and adequate ride safety measures.

160.    As a direct and proximate result of Uber's breaches of the duty of care owed, Plaintiff was subjected to nonconsensual sex with her Uber driver, John Kenney, Jr., and was raped by his accomplice, Charles Veney, whom Mr. Kenney called that evening to participate in the illicit acts.

161.    The acts and omissions of Uber detailed above were committed wantonly, willfully, with reckless and/or callous disregard for the safety of its passengers, including the Plaintiff.

**WHEREFORE**, Plaintiff brings this action and seeks damages against the Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00), as well as attorney's fees as permitted by law, costs, prejudgment interest, post judgment interest, punitive damages and any other costs or relief this court deems appropriate.

## COUNT II – NEGLIGENT HIRING, SUPERVISION AND RETENTION
### (Against Defendant Uber Technologies, Inc.)

162.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

163.    Uber owed Plaintiff and the general public the highest duty of care in the hiring, training, and supervision of its drivers to provide safe means and methods of transportation for its passengers.

34

164. Uber breached that duty of care in the hiring, retention and/or supervision of Mr. Kenney, who was unfit to be a provider of transportation, and who was not adequately trained or supervised in his driving and conduct with passengers.  Uber knew or should have known that Mr. Kenney would be a danger to passengers and lead to a risk of the very type of danger and harm that occurred on February 17, 2017.

165. As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Uber, Plaintiff sustained serious injuries.  Uber knew or should have known that its negligence and breach of duty of care would cause or had a substantial probability of causing severe emotional distress to Plaintiff, and, in fact, did cause her severe emotional distress.

**WHEREFORE**, Plaintiff brings this action and seeks damages against the Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00), as well as attorney's fees as permitted by law, costs, prejudgment interest, post judgment interest, punitive damages and any other costs or relief this court deems appropriate.

## COUNT III – FRAUD
### (Against Defendant Uber Technologies, Inc.)

166. Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

167. Defendant made intentional misrepresentations of fact to Plaintiff known by Defendant to be false, to wit, that Plaintiff would be safely taking an Uber ride with a driver whose background had been sufficiently screened by Uber, and who would provide her with safe passage, but who, in reality, Defendant had not screened in any meaningful way, and who was a grave threat to Plaintiff's safety and well-being.

168. Defendant made these misrepresentations to Plaintiff despite knowing that it had not implemented adequate safety and security measures, including adequate driver screening, background check procedures, ongoing monitoring of driver conduct while driving, and adequate ride safety measures.

169. Defendant further fraudulently misrepresented to Plaintiff that the Company would provide a safer ride home for her than had she driven home while intoxicated, and that the Company had the ability to and would, in fact, accurately track Plaintiff from where she was picked up to her destination.

170. Uber's false statements concerning its safety measures detailed herein were made knowingly, or with a willful, wanton, and reckless disregard for the truth, and intended to deceive and defraud Plaintiff into agreeing to utilize Uber's services.

171. Defendant made these misrepresentations with the intent to cause Plaintiff to rely on this false information and induce her into utilizing Uber's services, in spite of the concerns Plaintiff had about her safety.

172. Plaintiff actually and reasonably relied on the false facts and misrepresentations provided by Defendant when she agreed to utilize Uber's services, after being told that Uber had screened her driver and that he would provide her with safe transport.

173. As a result of Defendant's deliberate misrepresentations of material facts, Plaintiff suffered significant damages.

**WHEREFORE**, Plaintiff brings this action and seeks damages against the Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00), as well as attorney's fees as permitted by law, costs, prejudgment interest, post judgment interest, punitive damages and any other costs or relief this court deems appropriate.

## COUNT IV – BATTERY
### (Against Defendant Uber Technologies, Inc. and Defendant John Kenney, Jr.)

174.   Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

175.   The acts committed against Plaintiff by Defendant Kenney, acting as an agent of Defendant Uber, including his nonconsensual sex with the Plaintiff, amounted to a series of harmful and offensive contacts to Plaintiff, all of which were done intentionally and without Plaintiff's consent.

176.   Defendant Uber is liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious person.  They must do all that human care, vigilance and foresight reasonably can do under the circumstances to avoid harm to passengers.

177.   As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

178.   As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages.

179.   The conduct of the Defendants was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff brings this action and seeks damages against the Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00), as well as attorney's fees as permitted by law, costs, prejudgment interest, post judgment interest, punitive damages and any other costs or relief this court deems appropriate.

## COUNT IV – BATTERY
### (Against Defendant Uber Technologies, Inc. and Defendant Charles Veney)

180.  Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

181.  The acts committed against Plaintiff by Defendant Veney, acting as an agent of Defendant Uber, including his rape of the Plaintiff, amounted to a series of harmful and offensive contacts to Plaintiff, all of which were done intentionally and without Plaintiff's consent.

182.  Defendant Uber is liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious person.  They must do all that human care, vigilance and foresight reasonably can do under the circumstances to avoid harm to passengers.

183.  As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

184.    As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages.

185.    The conduct of the Defendants was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff brings this action and seeks damages against the Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00), as well as attorney's fees as permitted by law, costs, prejudgment interest, post judgment interest, punitive damages and any other costs or relief this court deems appropriate.

## <u>COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### (Against All Defendants)

186.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

187.    Defendant Kenney, Uber's employee, while carrying out his job duties, engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society, namely, his nonconsensual sex with an innocent, young woman who was a passenger in his Uber vehicle.

188.    Defendant Uber is liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care

and vigilance of a very cautious person.  They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers.

189.   By their actions and conduct, Defendants intended to and did intentionally and recklessly cause Plaintiff to suffer severe emotional distress.

190.   The conduct was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages

191.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, severe emotional distress, for which she is entitled to an award of damages.

**WHEREFORE**, Plaintiff brings this action and seeks damages against the Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00), as well as attorney's fees as permitted by law, costs, prejudgment interest, post judgment interest, punitive damages and any other costs or relief this court deems appropriate.


Respectfully submitted,

SMOUSE & MASON, LLC

/s/*Roy L. Mason*
Roy L. Mason (00922)
Zachary E. Howerton (20688)
223 Duke of Gloucester Street
Annapolis, Maryland 21401
410-269-6620 (tel)
410-269-1235 (fax)
rlm@smouseandmason.com
zeh@smouseandmason.com

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all causes of action.

/s/*Roy L. Mason*

Roy L. Mason (00922)